# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# NORTHERN DIVISION

| | |
|---|---|
| VERONICA S. RUBY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:12 CV 84 DDN |
| ) | |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Veronica S. Ruby for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff Veronica S. Ruby, born on May 28, 1974, filed applications for Title II and Title XVI benefits on October 28, 2009. (Tr. 101-05.) She alleged an onset date of May 30, 2008, due to mania, depression, and bipolar disorder. (Tr. 141). Plaintiff's

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

applications were denied initially on March 25, 2010, and she requested a hearing before an ALJ. (Tr. 56-70.)

On June 24, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 13-27.)  On October 4, 2012, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

In September 2009, plaintiff began seeing nurse practitioner Gretchen Anderson at Community Health Center.  On September 30, 2009, plaintiff saw Nurse Anderson to receive medication for bipolar disorder.  Plaintiff noted that despite wheezing loudly at night, she smoked one pack of cigarettes per day and was having difficulty quitting.  She also stated that she had not taken medication since 2000.  Nurse Anderson found that plaintiff did not meet the criteria for bipolar disorder but diagnosed her with depression. Nurse Anderson prescribed Albuterol and Claritin for wheezing and Celexa and Chantix.[2] She also noted plaintiff's history of physically and mentally abusive relationships. (Tr. 201.)

On October 27, 2009, plaintiff reported back to Nurse Anderson for a follow-up. She reported that she experienced an increased number of mood swings and that the Chantix gave her strange dreams.  She communicated that her mood was lighter but still awoke angry and experienced outbursts.  She also reported that she stopped smoking two weeks earlier.  Nurse Anderson increased plaintiff's Celexa dosage but discontinued Chantix.  Nurse Anderson additionally noted that plaintiff was receiving counseling at White Oaks. (Tr. 198-200.)

November 24, 2009, plaintiff met with Ted Oliver, M.S.W., L.C.S.W., and underwent a mental health evaluation in order to receive Medicaid. She divulged that between the ages of seventeen and twenty-five she had several psychiatric hospitalizations.  She alleged passive suicidal ideations, depressed mood, and anxiety

---

[2] Celexa is used to treat depression.  WebMD, http:www.webmd.com/drugs (last visited June 3, 2013).  Chantix is used to help quit smoking. Id.

- 2 -

regarding public places.  She endorsed symptoms of panic attacks including a racing heart, nausea, dizziness, and sweating.  Additionally, she complained of tearfulness, irritability, low energy and motivation, and insomnia.  She also reported to Mr. Oliver that she had smoked since her teenage years and despite a recent diagnosis of emphysema, was experiencing difficulty quitting her two packs per day habit.  She communicated to Mr. Oliver that prior to being prescribed Celexa the previous month she drank twelve or more beers per day in order to relax.  Mr. Oliver noted plaintiff's flat affect and depressed mood and that she appeared withdrawn and somewhat anxious. (Tr. 213-15.)

Mr. Oliver found that plaintiff had an extensive history of psychiatric problems related to depression dating back to her early adolescence.  He noted that she had a limited employment history, an eleventh grade education and a GED.  He explained that plaintiff communicated she had not been employed since 2003 but that her longest job was an over the road truck driver, lasting five years.  He also found that plaintiff's largest source of support was her roommate.  He diagnosed plaintiff with severe major depression without psychotic features, panic disorder with agoraphobia, and alcohol abuse in early sustained remission and gave a GAF of 45.[3]  He stated that plaintiff would benefit from access to health care for both primary health care and psychiatric needs.  He opined that plaintiff would be unable to work competitively on a full time basis and that she would likely be unsuccessful working on a part-time basis.  He further stated that her prescription regimen did not fully address her symptoms. (Tr. 214-15.)

---

[3] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patients GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job.) American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed. 2000).

- 3 -

Also on November 24, 2009, plaintiff saw Nurse Anderson for a third monthly check up. Plaintiff complained of increased panic attacks, depression, and reluctance to leave her home. She reported that she quit smoking. Plaintiff communicated that she did not attend her counseling appointments during the past two weeks and that she continued to suffer from anger and anxiety. Nurse Anderson replaced the prescription for Celexa with a prescription for Paxil.[4]  (Tr. 234-35.)

On December 15, 2009, plaintiff visited Nurse Anderson for a follow up. Plaintiff told Nurse Anderson that she wore earplugs at night because the noise irritated her, that her symptoms worsened since starting Paxil, and that she missed further counseling appointments. Nurse Anderson continued plaintiff on Paxil and also prescribed Lamictal.[5]  (Tr. 231-32.)

On December 30, 2009, plaintiff saw Nurse Anderson and reported that she tolerated Paxil and Lamictal well. She communicated that despite moodiness in the morning, her symptoms improved. Nurse Anderson refilled Paxil and increased plaintiff's Lamictal dosage. She also noted that plaintiff appeared more relaxed and planned to see Ted Oliver at Mark Twain Behavioral Health. (Tr. 227-28.)

On January 29, 2010, plaintiff began outpatient psychiatric treatment with psychiatrist Dr. Joseph Spalding, D.O. Plaintiff described waking up very angry, throwing things and breaking things. Additionally she described panic upon leaving the house and becoming short of breath due to feeling that people judge her. Plaintiff informed Dr. Spalding of a previous diagnosis of bipolar disorder, her Paxil and Lamictal prescriptions, and that her prescriptions had improved her symptoms. Plaintiff also reported that she smoked marijuana daily and that she had been sober for two months but

---

[4] Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder, anxiety disorders and posttraumatic stress disorder. WebMD, http:www.webmd.com/drugs (last visited June 3, 2013).

[5] Lamictal is used to prevent the extreme mood swings of bipolar disorder in adults. WebMD, http:www.webmd.com/drugs (last visited June 3, 2013).

drank two beers the previous evening. Dr. Spalding found that plaintiff had a very dramatic childhood, was put into foster care, and had been previously jailed. Dr. Spalding noted that plaintiff was alert and oriented, her mood and affect was euthymic, her flow of thought was logical and goal oriented and her content was negative for suicidal or homicidal ideation, intent, or plan. (Tr. 245-46.)

Following the January 29, 2010, appointment, Dr. Spalding determined that plaintiff had reported a clear manic history. He diagnosed plaintiff with bipolar I disorder depressed without psychotic features, panic disorder with agoraphobia, posttraumatic stress disorder, and cannabis dependence and gave a GAF score of 45. Dr. Spalding recommended plaintiff receive counseling at Mark Twain and return for a follow up with him in a month. He increased plaintiff's Paxil dosage, continued her on Lamictal and advised her to discontinue marijuana use. (Tr. 246-47.)

On February, 9, 2010, plaintiff contacted Dr. Spalding by phone, complaining that the increased dosage of Lamictal caused night sweats. Dr. Spalding recommended that she decrease her Lamictal dosage. He ordered that if her symptoms did not improve she was to contact him again. (Tr. 244.)

On February 24, 2010, plaintiff had another appointment with Dr. Spalding. She divulged that she was applying for disability, that she had not worked since 2003, and that she has held over sixty jobs in her lifetime. Regarding her family history she told Dr. Spalding that she had been married three times, and that she had seven children with five different fathers but only was able to see the youngest set of twins as the others had been adopted. She reported that she had quit drinking, reduced her marijuana usage to once a week but smoked two packs of cigarettes per day. Plaintiff additionally complained that she felt more depressed and constantly tired. Dr. Spalding refilled her Lamictal and replaced Paxil with Lexapro.[6] He also instructed her to return in one month. (Tr. 241-42.)

---

[6] Lexapro is an antidepressant used to treat depression and anxiety. WebMD, http:www.webmd.com/drugs (last visited June 3, 2013).

On March 24, 2010, Stanley Hutson, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff.  He found that plaintiff's medically determinable impairments consisted of bipolar disorder, panic disorder with agoraphobia, posttraumatic stress disorder, alcohol abuse in early sustained remission and cannabis dependence.  He stated that plaintiff suffered mild restriction with daily living activities, moderate difficulty with maintaining social functioning and moderate difficulty with maintaining concentration, persistence, or pace.  (Tr. 251-62.)

On March 24, 2010, Dr. Hutson also submitted a Mental Residual Functional Capacity Assessment.  He concluded that plaintiff retained the ability to understand, remember, and carry out simple work instructions; to maintain adequate attendance and an ordinary routine without special supervision; to interact adequately with peers and supervisors; and to adapt to most usual changes in a competitive work setting.  (Tr. 265.)

On March 25, 2010, medical consultant Kelly Popp submitted a Physical Residual Functional Capacity Assessment. She found that the plaintiff could push and pull an unlimited amount, including operation of hand and foot control.  She found that plaintiff could carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk about six hours in an eight-hour workday, and sit about six hours.  She also found that plaintiff should avoid concentrated exposure to humidity and fumes, odors, dusts, gases, and poor ventilation.[7]  Ms. Popp noted that plaintiff did not allege any physical impairments and found her primary diagnosis to be emphysema.  In regards to plaintiff's exertional limitations, Ms. Popp stated that despite plaintiff's recent emphysema diagnoses she continued to smoke two packs of cigarettes per day and that plaintiff claimed she had quit smoking and alleged she could walk farther than before.  Ms. Popp concluded that plaintiff was capable of handling medium exertional work.  (Tr. 266-71.)

On August 31, 2010, plaintiff saw Dr. Spalding.  She stated that she had submitted an application for low income housing and felt that having her own residence would

---

[7] In reviewing this form, the court had difficulty reading the "X"s in the marked boxes.  The existence of the "X"s is corroborated by the consistent findings of the ALJ in her opinion.  (Tr. 18-26.)

improve her mood. She told him that despite her twin boys living in Quincy, Illinois, with their father she was visiting them more often and that they would be moving in with her when she acquired housing. She complained of being crabby and angry in the morning because her roommate was waking her up with the television. Additionally, she communicated that she rarely drank but smoked marijuana every other day. Dr. Spalding continued plaintiff's medication regimen. (Tr. 291-93.)

On October 26, 2010, plaintiff returned to Dr. Spalding and complained of increased nightmares, sensitivity to noise, and difficulty sleeping. She divulged that she failed to obtain low income housing. Additionally, she shared that the twins' father would no longer allow them to live with her but she was still seeing them once during the week and on weekends in Quincy, Illinois. She stated that she got "pretty drunk" in the beginning of October, but had not drank since, and that she had only smoked marijuana twice in the past month. She continued to smoke cigarettes. Dr. Spalding noted that plaintiff was alert and oriented during the appointment and that her mood and affect was a bit restricted but fair. He also stated that plaintiff was negative for suicidal or homicidal ideation, intent or plan and that her insight and judgment were fair. Dr. Spalding continued plaintiff's Lexapro, increased her Lamictal dosage, and prescribed Restoril.[8]  (Tr. 288-90.)

On December 8, 2010, plaintiff visited Dr. Spalding for a fifth time. She told him that she was feeling more depressed and tearful every morning. She explained that she could not move into her own apartment due to lack of financial support because the twins' father was not allowing her to have custody of them. She also said that she experienced paranoia and thought people constantly talked about her. She cited paranoia as the primary reason she failed to attend work, causing her unemployment. She also communicated that her roommate paid for her prescriptions and when he did not, she went without them for one or two weeks. Dr. Spalding wrote a letter to her roommate,

---

[8] Restoril is used to treat insomnia. WebMD, http:www.webmd.com/drugs (last visited June 3, 2013).

emphasizing the importance of her medications. Dr. Spalding noted that plaintiff was alert and oriented throughout the appointment but that her mood and affect was depressed and tearful. He also stated that she was negative for suicidal or homicidal ideation, intent or plan. He refilled her Restoril and Lamictal prescriptions and increased her dosage of Lexapro. (Tr. 285-87.)

On May 4, 2011, plaintiff saw Dr. Spalding. She communicated that she drank about three times per month and smoked marijuana daily. She also stated, "If I drink, I drink to get drunk." She stated that she was depressed because of her living arrangements. Dr. Spalding indicated that plaintiff would have to pass a drug screening to get any further prescription refills. (Tr. 329-30.)

On May 27, 2011, Dr. Spalding completed a Medical Source Statement detailing plaintiff's mental capacity to work and asserting that plaintiff's disability began on May 30, 2008. He found that plaintiff suffered mild restrictions with understanding and remembering simple instructions. She had moderate restrictions with performing simple instructions; with her ability to make simple work-related decisions; with her ability to understand, remember, and perform complex instructions; and with her ability to make complex work-related decisions. He also determined that plaintiff had marked limitations with interacting appropriately with supervisors, coworkers, and the general public; and with responding appropriately to usual work situations and to changes in a routine work setting. To make these findings, he relied on several factors, including her bipolar disorder, panic disorder, depressive episodes, racing thoughts, distractibility, and multiple hospitalizations due to suicide attempts, anger episodes with extreme agitation, suicidal ideation, and violent behavior. He concluded that total abstinence from alcohol and drugs would not significantly change plaintiff's behaviors. Finally, he found that plaintiff would be able to manage benefits in her best interest. (Tr. 324-26.)

**Testimony at the Hearing**

The ALJ conducted a hearing on June 3, 2011. (Tr. 13-53). Plaintiff testified to the following. She is thirty-seven years old. She is five feet, eight inches tall and weighs

210 pounds. She received her GED in May 1993. She is married but does not live with her husband. She has seven children but does not have custody of them. Her first child died in November 1993 from aspirating formula for which she was held responsible, and since that time the State of Illinois has taken her children. (Tr. 35-38.)

She last worked in May 2008 as a cashier at Piccadilly but was fired for not meeting all of her job duties. She did not get along with people at work or customers. She has had at least thirty jobs in the past. Her employment generally lasts three to four weeks at a time. She cannot maintain employment because she suffers severe depression and cannot leave her house to go to work. During her longest term of employment, she worked as a truck driver with four different companies but she was fired after the insurance could no longer cover her due to wrecks and speeding tickets. She also failed to meet delivery schedules. (Tr. 35-39.)

Her psychological treatment has been sporadic. She first received psychological treatment at sixteen after trying to slice her wrist. She was in the hospital for two months. In 2000, she sought psychiatric treatment for the loss of her children and her employment problems. She received counseling and took medication. She did not receive psychological treatment again until May 2009 with Dr. Anderson. Although she continued to experience psychological problems between 2000 and 2009, she could not afford the medication or stopped attending treatments because she did not feel that it was helping. (Tr. 40-41.)

She currently takes mood stabilizers and depression medication but they have no effect. She feels depressed four or five times a day, including when she awakens. She cries two or three times a day when thinking about her children and her inability to support and take care of herself or arguing with her roommate. (Tr. 41-43.)

On average, she showers once or twice per week. She lacks the motivation to leave her bedroom to bathe. She has not brushed her teeth in three or four months. She cannot care for herself and wishes she could improve her personal hygiene, talk to people, maintain friendships, and support herself financially. At least once a month she does not leave her bed for a week. (Tr. 43-45.)

She thinks of killing herself at least two or three times per day but would not do it, reasoning that "it's a long term solution to a short term problem." She feels anxious at least once or twice per day. When she feels anxious, she sweats profusely, her heart races, she cannot catch her breath, she turns red, and gets angry. Although going to the back yard does not cause anxiety, the front yard causes anxiety because she does not want her neighbors to see her. She does not like to talk to her neighbors. If her neighbors try to talk to her, she gives short answers and makes excuses to return to her house. (Tr. 45-47.)

Vocational Expert (VE) Robert G. Laskey also testified at the hearing. Plaintiff's last jobs were as a truck driver and cashier, which involve light and semi-skilled work. The ALJ presented a hypothetical individual who must stay in her house one week per month, cries three times a day for one to three hours, exhibits marked limitations with interacting with the public, supervisors and co-workers, marked limitations in the ability to respond to changes in the routine work setting, and moderate limitations in her ability to make simple or complex work related decisions, and carry out simple or complex instructions. The VE found that such a person would be unemployable. (Tr. 48-49.)

The ALJ further elaborated on the first hypothetical individual limiting her to perform unskilled work and limited connections with co-workers, supervisors or the general public. The VE responded that this person would also be unemployable. (Tr. 49.)

The ALJ provided a second hypothetical individual who was thirty-seven years old, had her GED, had the ability to perform unskilled work, one to two step operations and has limited contact with supervisors, co-workers and the general public. The VE responded that such a person could not perform plaintiff's past relevant work but could perform as a document preparer, which is unskilled, sedentary work with about 68,000 positions in Missouri and 2,800,000 jobs nationally. The VE noted that document preparer falls under the occupational group of general office clerks in which there are a couple of hundred different jobs requiring sedentary and light work. Additionally, the VE stated that the hypothetical individual could perform within the general occupation

- 10 -

group of elemental hand worker as a garment sorter, which is unskilled, light work with about 8,600 jobs in Missouri and about 430,000 jobs nationally.  The VE also noted the individual could perform as an assembler of small products of which there are 30,000 positions in Missouri and 1,100,000 positions nationally.  He further stated that an assembler of small products is within the occupational group of different assemblers and fabricators, except for machine, electrical, electronic and precision assemblers, in which there are three hundred different jobs.  (Tr. 50-52.)

### III. DECISION OF THE ALJ

On June 24, 2011, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 10-31.)   At Step One of the prescribed regulatory decision-making scheme,[9] the ALJ found that plaintiff had not engaged in substantial gainful activity since May 30, 2008, the alleged onset date.  At Step Two, the ALJ found that plaintiff's severe impairments were bipolar disorder, panic disorder, posttraumatic stress disorder (PTSD), history of alcohol abuse, cannabis dependence, history of emphysema, and obesity.  (Tr. 15.)

At Step Three, the ALJ found that plaintiff had no impairments or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments.  (Tr. 16.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform medium work but limited her to unskilled tasks and limited contact with supervisors, co-workers, and the general public.  At Step Four, the ALJ found that plaintiff was unable to perform any past relevant work.  (Tr. 18-26.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy.  (Tr. 26.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and

---

[9] See below for explanation.

- 11 -

are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

# V. DISCUSSION

Plaintiff argues that (1) the ALJ's credibility determination regarding plaintiff was erroneous; (2) the ALJ erred by improperly discounting the opinion of plaintiff's treating physician, Dr. Spalding; and (3) the ALJ erred in finding that plaintiff's impairments did not meet or equal Listing Impairment 12.04 or 12.06.

## A. Plaintiff's credibility

Plaintiff argues that the ALJ's determination of plaintiff's credibility regarding the severity of her mental condition was patently erroneous.

The ALJ's credibility findings must be supported by substantial evidence on the record as a whole. Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004). The ALJ must give full consideration to all of the relevant evidence on the Polaski v. Heckler factors and may not discredit subjective complaints unless they are inconsistent with the evidence in the record as a whole. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1986); Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011).

Plaintiff argues that the ALJ improperly relied on non-compliance when discrediting her psychiatric symptoms. When an ALJ relies primarily on evidence of noncompliance to discredit a claimant's psychiatric symptoms, the reviewing court need not defer to the ALJ's decision on that issue. Watkins v. Astrue, 414 Fed.Appx. 894, 896 (8th Cir. 2011). However, the ALJ outlined numerous pieces of evidence and cited multiple factors to support the credibility finding including plaintiff's sporadic treatment history, inconsistencies in the record indicating that plaintiff exaggerated her symptoms, plaintiff's limited work history, plaintiff's non-compliance with treatment plans and the fact that plaintiff's condition has been stabilized by prescription medication.

The record indicates that plaintiff has exaggerated her symptoms in the past. The ALJ may discredit a plaintiff if the plaintiff has made obvious, exaggerated, or inconsistent statements in her testimony or on the record. See Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008); O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

At plaintiff's initial meeting with Dr. Spalding she stated that she had been previously diagnosed with bipolar disorder six months earlier. On the contrary, Nurse Anderson specifically noted that plaintiff did not meet the diagnostic standards for bipolar disorder and there is no other bipolar disorder diagnosis in the record. (Tr. 201, 247.) Additionally, when plaintiff visited Dr. Oliver in 2009, she told him that she had been unemployed since 2003. However, according to plaintiff's work history report and testimony at her ALJ hearing, she had last been employed as a cashier as recently as 2008. (Tr. 35-36, 165, 214.)

An ALJ may also reject a claimant's testimony if there are infrequent visits for treatment. Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2008). The record indicates that plaintiff has not been hospitalized since 2000 she received no psychiatric treatment or medication between 2000 and 2009. (Tr. 40-41, 201.)

The ALJ specifically noted that plaintiff's lack of treatment and symptom documentation prior to 2009 makes it difficult to find a more restrictive RFC prior to September 30, 2008, the date she was last insured. (Tr. 23-24.) To receive disability insurance benefits under Title II of the Act the claimant must establish that she was insured under the Act when she was disabled. 42 U.S.C. § 423(c); 20 C.F.R § 404.130-131; Hinchey v. Shalala, 28 F.3d 429, 431 (8th Cir. 1994); Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992). Plaintiff alleges an onset date of May 30, 2008, and was last insured September 30, 2008 but failed to seek treatment until September 2009, a year later. (Tr. 136-37, 201.)

Additionally, after beginning treatment in September 2009, plaintiff's appointments and treatment schedule were sporadic. In 2010 plaintiff allowed six months to pass in between appointments and in 2011 plaintiff failed to return to Dr. Spalding for a follow-up visit for almost five months, despite being instructed to check in monthly. (Tr. 242, 286, 291, 329.)

Further, "[a]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). Plaintiff testified that she lacks the motivation to get out of bed one

week every month and that she cries everyday for one to three hours a day but her testimony and the record provide evidence contradicting her statements. (Tr. 42-43, 44-45, 47.) Although she does not have custody of her children, plaintiff still travels to see her twin sons in Quincy, Illinois once a week and on the weekends. (Tr. 289.) She also discussed the possibility that they would move in with her fulltime if she acquired low income housing. (Tr. 291.) Plaintiff also notes that her hobbies include socializing with friends at her house, caring for her plants, and sewing, and that she engages in these activities "everyday, all day." (Tr. 154.) Plaintiff's daily activities and testimony are inconsistent with her assertion of disability.

The ALJ's credibility determination is supported by substantial evidence.

**B. Opinion of Dr. Spalding**

Plaintiff argues that the ALJ erred by failing to properly accord the opinion of Dr. Spalding great weight.

"[A] treating physician is normally entitled to great weight." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). However, an ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id. Further, "[i]t is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." Davidson v. Astrue, 578 F.3d 838, 843 (8th Cir. 2009); Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005).

The ALJ found that Dr. Spalding's opinion regarding plaintiff's ability to work was inconsistent with his treatment notes and the record. (Tr. 25.) Dr. Spalding's opinion indicates that plaintiff suffers from marked limitation in her ability to interact appropriately with the public, supervisors, and co-workers, and to respond appropriately to work situation and changes in routine work settings. (Tr. 25, 325.) Dr. Spalding asserted he came to these conclusions based on plaintiff's suicidal ideation and violent behavior. (Tr. 325.) Although Dr. Spalding noted that the plaintiff exhibited anger and

extreme agitation, in every treatment note on record he found plaintiff negative for suicidal or homicidal ideation, intent or plan. (Tr. 242, 246, 249, 286, 289, 292, 330, 332.) Thus Dr. Spalding's treatment notes contradict the record.

Significantly, consistent with Dr. Spalding's opinion, the ALJ found that plaintiff's RFC included limited contact with the public, supervisors, and co-workers and found her capable of only unskilled work. To the extent that the ALJ deviated from Dr. Spalding's opinion, substantial evidence supports the ALJ's decision to give Dr. Spalding's opinion less than great weight. Accordingly, plaintiff's argument is without merit.

**C. Listing Impairments 12.04 and 12.06**

In the third step of the sequential evaluation, the ALJ must determine if the claimant has an impairment described in the listing of impairments. See 20 C.F.R. §§ 404.1520a (4)(iii), 416.920(a)(4)(iii); 20 C.F.R. pt. 404, subpt. P, App. 1. If the claimant has an impairment, or a combination of impairments, that match or are substantially equivalent to an impairment in the Listing of Impairments, the applicant is disabled per se. 20 C.F.R. 1520d; Bowen v. City of New York, 476 U.S. 467, 471 (1986); Carlson v. Astrue, 604 F.3d 585, 592 (8th Cir. 2010). Equivalence is to be determined "on medical evidence only." 20 C.F.R. § 1526b. To meet or equal a listing, the claimant must "'present medical findings equal in severity to all the criteria for the one most similar listed impairment.'" Carlson, 604 F.3d at 594 (quoting Sullivan v. Zebley, 493 U.S. 521, 531 (1990)).

When evaluating the severity of mental impairments, the ALJ must follow the special technique provided by 20 C.F.R. § 404.1520a. The ALJ determines the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decomposition. 20 C.F.R. §404.1520a (3)(iii). The ALJ is required to incorporate the results of this technique into their findings and conclusions. 20 C.F.R. § 404.1520a(4)(ii). However, an ALJ does not err when she "fails to explain why an impairment does not equal one of the listed

impairments as long as the overall conclusion is supported by the record." Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Plaintiff argues that the ALJ incorrectly determined that she did not meet or equal Listing 12.04 or 12.06 which cover affective disorders and anxiety related disorders. Under Listing 12.04 eligibility may be established by meeting the severity requirements for paragraph A and paragraph B or by meeting the requirements of paragraph C. 20 C.F.R. pt. 404, subpt. P, App. 1 §12.04. In order to establish eligibility under 12.06, plaintiff must satisfy paragraph A, and either paragraph B or C. 20 C.F.R. pt. 404, subpt. P, App.1.

Plaintiff specifically challenges the ALJ's determination regarding the B criteria, which are identical for both Listing 12.04 and Listing 12.06. To satisfy the B set of criteria for Listing 12.04 and Listing 12.06, a claimant must show that she suffers at least two of the following:

    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration.

Id. Plaintiff argues that the ALJ erred by determining that plaintiff suffered only mild restriction in activities of daily living, only moderate difficulties in maintaining social functioning, only moderate difficulties regarding concentration, persistence, and pace, and no lengthy episodes of decompensation. The regulations define the relevant terms as follows:

> Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.

\* \* \*

> 1. Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office.
>
> * * *
>
> 2. Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.
>
> * * *
>
> 3. Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings.
>
> * * *
>
> 4. Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.

Id.

The ALJ's decision fully addresses the reasons why plaintiff did not meet or equal the paragraph B criteria required.  (Tr. 16-17).

In regards to the determination that the plaintiff is mildly restricted in activities of daily living, the ALJ relied on reports that she takes care of plants, hangs out with friends at her house, crochets and sews, plays tetris, does laundry, drives, and sees two of her children three times per week.  (Tr. 16, 152, 154, 160, 173, 177, 288.)  Additionally, the ALJ determined that although plaintiff claims to have poor hygiene with intermittent bathing, none of the medical records contain support for that assertion or note hygiene related problems on examination.  (Tr. 16.)

In regards to the determination that claimant has moderate difficulties in social functioning, the ALJ cited records indicating that plaintiff lost interest and no longer wanted to attend work as she lacked motivation.  (Tr. 16, 241.)  Plaintiff argues that she

- 18 -

has symptoms of anxiety and panic when around people and that she was diagnosed by Dr. Spalding with posttraumatic stress disorder and panic disorder. Additionally plaintiff states that Dr. Spalding opined that she is markedly limited in her social interactive work capacity based on her suicidal thoughts and violent behavior but none of these notes appear in any of Dr. Spalding's treatment record. (Tr. 16, 242, 246, 249, 286, 280, 290, 330, 332.) On the contrary, reports show that plaintiff hangs out with friends, lives with a roommate, and sees her twin boys in Quincy, Illinois weekly. (Tr. 16, 152, 288.)

Regarding concentration, persistence, or pace the ALJ found that plaintiff has moderate difficulty. Plaintiff argues that she has marked limitations based on her lack of motivation for simple tasks, personal hygiene, and being dismissed from employment based on a failure to her job as directed. However, the record indicates that plaintiff's psychiatrist has consistently noted that plaintiff had fair judgment and insight on mental status examination and logical and goal-directed flow of thought. (Tr. 17, 242, 246, 249, 286, 289, 292, 330, 332.) The ALJ relied on plaintiff's doctor's finding that she could handle her own money, was only mildly limited in her ability to understand simple instructions and moderately limited in her ability to carry them out, that she is moderately limited in her ability to make judgments on simple and complex work-related decisions and to understand, remember and carry out complex instructions. (Tr. 17, 324, 326.)

Finally, the ALJ noted that plaintiff had experienced no episodes of decomposition of extended duration and cited that there were neither allegations nor evidence that any such episodes had occurred during the adjudicative period. (Tr. 17.) She noted that the plaintiff failed to make any allegations or show any evidence of episodes of decompensation and instead appeared relatively stable on medication. (Id.) Therefore, the ALJ went through a complete and well reasoned analysis when concluding that plaintiff's impairments did not cause at least two marked limitations.

The ALJ correctly determined that plaintiff's mental impairments do not meet a listing impairment under §§ 12.04 and 12.06. Thus, plaintiff's argument is without merit.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


       /S/   David D. Noce       
**UNITED STATES MAGISTRATE JUDGE**


Signed on July 29, 2013.